IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JENNIFER S. OLSZOWKA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 15 C 6060 |
| v. ) | |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting ) | Maria Valdez |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying a claim of Jennifer S. Olszowka for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 13] is denied and the Commissioner's cross-motion for summary judgment [Doc. No. 22] is granted.

## BACKGROUND

### I. PROCEDURAL HISTORY

In April, 2011, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability since January 1, 2011. (R. 196.) The claim was denied initially and upon reconsideration, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"). On November 29, 2012, Plaintiff, who was represented by counsel, personally appeared and testified before the ALJ.

Vocational expert Richard T. Fisher also testified. (R. 75.) At a second hearing on September 12, 2013, the ALJ received additional testimony from Plaintiff, vocational expert Michelle Peters, and medical expert ("ME") Ronald Semerdjian, M.D. (R. 27.)

On January 27, 2014, the ALJ denied Plaintiff's claim for Disability Insurance Benefits, finding her not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. **Medical Evidence**

Plaintiff has both lupus and fibromyalgia. She was treated by rheumatologist Dr. Arnold Lim beginning in January 2008. (R. 359.) After he moved, she was examined once on February 25, 2010 by another doctor in his original practice, Dr. Sydney Brandwein, M.D. (R. 359-61.) Plaintiff reported generalized pain and being easily tired, and specifically neck, musculoskeletal, and gastrointestinal symptoms. Dr. Brandwein concluded that her lupus and fibromyalgia were currently stable, with symptoms including arthralgias, soft tissue pain and myofascial tenderness, nonrestorative sleep disorder, fatigue, and Raynaud's phenomenon. (R. 361.) Although he recommended a follow-up visit in six months, Plaintiff did not see Dr. Brandwein further because she did not feel comfortable with him. (R. 88, 361.)

2

Plaintiff's current treating rheumatologist, Thomas P. Palella, M.D., examined her at least thirteen times between February 2011 and November 2013. (R. 347, 368-74, 390-91, 414, 425, 446-47.) Dr. Palella documented fatigue, soreness, limitations in concentration, and limitations in her abilities to grasp items and to get dressed without assistance. He treated Plaintiff's conditions with medications including Prednisone, Plaquenil, and the pain medications Tramadol and oxycodone. (R. 405.) He also recommended that she rest and pace her activities. (R. 387.)

On August 8, 2011, Scott A. Kale, M.D. performed a consultative exam. (R. 310-18.) Plaintiff reported generalized pain and tenderness, mild "fibro-fog," and depression, as well as headaches, sun sensitivity with hair loss, and occasional Raynaud's phenomenon. The primary reason she claimed she could not work was pain and anxiety caused by stress. As for her activities of daily living, Plaintiff advised that she could feed, bathe, dress, and toilet herself, as well as drive a car and take public transportation. In her exam, she was able to perform manual and orthopedic maneuvers without difficulty. (R. 312-13.) Her ranges of motion were normal in all joints except her lumbar spine, where she demonstrated mild limitations. (R. 314-15.) She displayed no redness or swelling in any joints, but she had 18/18 tender points associated with fibromyalgia. (R. 312.) Her neurological and mental status exams were largely normal. (R. 317.) Dr. Kale listed pain and anxiety associated with stress as Plaintiff's main mental status issues. (*Id.*)

3

In September 2011, two consulting physicians issued opinions about Plaintiff's mental and physical restrictions. First, on September 7, reviewing psychologist Michael E. Cremerius, Ph.D. completed a Psychiatric Review Technique Form ("PRTF") after reviewing Plaintiff's file, including Dr. Kale's report. Dr. Cremerius concluded that, despite her reports of depression, Plaintiff had no medically-determinable mental impairment. (R. 320, 332.) In a Physical RFC Assessment completed September 8, 2011, Ernst Bone, M.D. noted that Plaintiff was diagnosed with fibromyalgia in 2002 and with lupus in 2008, and that she suffers from chronic pain, hypertension, and arthritis. (R. 335, 339.) Based in part on Dr. Kale's exam, Dr. Bone determined that Plaintiff was able to perform the exertional and sit/stand demands of light work, but she was limited to only occasional climbing, balancing, stooping, kneeling, crouching, or crawling due to pain. (R. 335.) He found her statements regarding the physical limitations imposed by her illness to be credible and consistent with the limitations in his RFC assessment. (R. 341.)

From December 2012 through April 2013 Plaintiff saw Paul A. Marsiglia, D.O, in connection with pain in her neck, shoulder, and head. (R. 405-19.) Dr. Marsiglia prescribed a muscle relaxant, which provided some relief. (R. 406, 412.) A course of aqua therapy was also helpful. (*Id.*) Dr. Marsiglia also referred Plaintiff to psychologist Timothy R. Tumlin, Ph.D. for a psychological screening examination. (R. 420.)

On December 19, 2012 and January 9, 2013, Dr. Tumlin evaluated Plaintiff over two appointments, using a clinical interview and various assessments including a Multidimensional Pain Inventory, a Survey of Pain Attitudes, and a Personality Assessment Inventory ("PAI"). (R. 420.) Based on these tests, Dr. Tumlin concluded that Plaintiff "did not exaggerate her difficulties nor did she attempt to portray herself in a more favorable or fault-free light than was true." (*Id.*) Plaintiff reported that her pain medications were "pretty good" at relieving her pain but caused some memory impairment. (R. 421.) Her PAI indicated that she was "experiencing a significant degree of depression characterized by affective symptoms such as feelings of sadness and distress" and loss of interest in activities. She also displayed cognitive symptoms of depression "to a lesser but still noteworthy extent." (R. 422.) Dr. Tumlin opined that Plaintiff's "coping" with her pain was "very good," and that she "could benefit from further psychological services because she is open to learning new ways to adapt to her pain." (R. 424.)

In March 2013, Dr. Palella completed an Attending Physician Statement for Plaintiff's insurer, which included a comprehensive assessment of her physical capabilities. (R. 433-34.) The report states that while Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, she was able to sit, stand, and walk just one hour each per day, intermittently. She could not climb, twist, bend, stoop, reach above shoulder level, or perform repetitive fine finger movements. He found that she had a moderate limitation in psychological function, with an ability to tolerate "only limited stress situations in only limited personal

relations." (R. 434.) Dr. Palella attributed Plaintiff's work restrictions to "extreme fatigue" and "restricted physical mobility due to pain and inflammation," and "decreased judgment due to prescribed narcotic pain medication." (*Id.*) He suggested that Plaintiff could benefit from physical therapy. (*Id.*)

### B. Plaintiff's Testimony

In June 2011, Plaintiff submitted a written report[1] describing her illness and level of function. (R. 239-51.) She indicated that she is able to make breakfast and lunch in the morning but then goes back to bed. (R. 244.) She wakes up numerous times per night due to pain and has impaired memory. (R. 244, 250.) She is able to do the dishes daily and laundry weekly, along with some ironing and vacuuming, and she goes grocery shopping weekly. (R. 245-47.) She has difficulty holding a pen for long periods of time, and too much physical activity causes pain that can endure for a week. (R. 247-48, 250.)

Plaintiff's husband also submitted a report in June 2011 in which he indicated that Plaintiff suffered from extreme fatigue, muscle aches and pains, and nausea. (R. 229.) Plaintiff was able to perform some housework, prepared meals four to seven times a week, and went out two to three times a week including grocery shopping; however, some days were "lost" due to nausea. (R. 230-31, 233.)

---

[1] In lengthy written testimony not directly relevant to the Court's reasoning in this decision, Plaintiff linked her increase in symptoms to the stress of her former job. (R. 239-42.) After a change in position within the same workplace, she was required to greet 300 or more people per day who came to the unemployment office, while continuing to fulfill her numerous other duties. (R. 239, 241.) She described being "sick to my stomach every day" after starting in that position, with a 50-pound weight loss and increasing pain and fatigue. (R. 241-42.) She was experiencing financial stressors arising from her lack of income, but indicated that medical advice and her own experience dictated that could not return to the same work she did before. (R. 243.)

6

She slept poorly and had impaired memory and concentration, as well as reduced motor skills in her hands. (R. 230, 232, 234.) Sunlight and stress triggered her condition. (R. 236.)

In an October 2011 follow-up report, Plaintiff indicated that she had increased pain in her arms, hands, and neck, and she was experiencing more migraines. (R. 272.) She had a harder time using her hands and took longer to do chores. (R. 275.)

At her first hearing on November 29, 2012, Plaintiff testified that she has a hard time sitting for a long period of time. Her hands were "the worst," and repetition bothered her hands and shoulders. She got sore and fatigued quickly, and was "good for about an hour" of activity before needing to rest. If she pushed herself too hard, she ended up "paying for it." Her memory and comprehension were impaired. (R. 81-82.)

Plaintiff explained that she could do basic cleaning and cooking "in spurts" but needed rest and pace herself due to fatigue and pain. (R. 81-82, 91-92.) She sometimes had trouble lifting her arms to dress herself, and she got easily winded. (R. 90.) She could do simple crafts for about an hour in a day. (R. 86.) She took naps every day. (R. 93.) She had two or three good days per week. (R. 98.) She estimated that she was able to drive five or ten miles. (R. 97.) She attended a lupus support group, and once or twice a month she volunteered playing with cats at a pet shelter. (R. 83, 96.) Sun exposure aggravated her condition. (R. 89.) She went to Wisconsin

7

for three days, but was then "laid up for about five days" due to sun exposure and over-exertion. (R. 85.)

At a second hearing on September 12, 2013, Plaintiff testified that she had developed additional hip and back pain, and that her neck pain had worsened to the point that some days she could not drive. (R. 33-34.)

### C. <u>**Medical Expert Testimony**</u>

Medical expert Ronald Smerdjian, M.D. testified at Plaintiff's second hearing. He opined that her impairments did meet or equal the listing for lupus, though she did have fatigue. (R. 37, 63.) He characterized her test results as including antinuclear antibody tests that were sometimes positive and sometimes negative, and sedimentation rate tests that were negative on all but one occasion. (R. 44-46.) Based on the degree of therapy provided, which included opiate medications, Dr. Semerdjian adjudged Plaintiff to be in severe pain. (R. 42, 54-55.) However, he also concluded based on her ability to drive that her opiate medications did not impose significant functional restrictions. (R. 54-55.) He also agreed with the ALJ's assessment that the fact Plaintiff could drive was inconsistent with treatment notes indicating that she was having trouble with her activities of daily living. (R. 64-65.)

Though Dr. Semerdjian acknowledged that swelling in the hands might impair fine manipulations, he opined that the available record did not suggest that Plaintiff's swelling was typically or chronically present. (R. 48-49, 53.) He testified that Plaintiff's lupus, taken alone, left her capable of lifting twenty pounds occasionally and ten pounds frequently, sitting for six hours and standing or

8

walking for two hours in an eight hour work day. (R. 48.) She needed avoid environments with extreme temperatures. (*Id.*) When asked to consider Plaintiff's fibromyalgia along with her lupus, Dr. Semerdjian noted that there was indication that Plaintiff had complained of memory impairment and severe fatigue. (R. 55-56, 60.) Dr. Semerdjian concluded that Plaintiff's fatigue was likely related to her fibromyalgia. (R. 60.)

### D. ALJ Decision

The ALJ issued his decision on January 27, 2014. As an initial matter, he noted that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. (R. 16.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2011. (*Id.*) At step two, the ALJ found that Plaintiff has the severe impairments of fibromyalgia, myofascial pain syndrome, migraines, and systemic lupus erythematous. (*Id.*) He also found that she did not have medically-determinable impairments of depression and anxiety. (*Id.*) The ALJ concluded at step three that Plaintiff's impairments, alone or in combination, did not meet or medically equal a Listing. (R. 17.) The ALJ then determined that Plaintiff retained the RFC to perform work at a light exertion level as defined in the regulations, but that she could only stand or walk for two hours in an eight-hour day. Additionally, she could not work in environments with unprotected heights, heavy equipment or operating machinery, or temperature extremes. (R. 17.) The ALJ did not include in his RFC assessment any restrictions based on fatigue or impaired memory. (*Id.*)

9

The ALJ determined at step four that, given her RFC and vocational profile, Plaintiff was capable of performing her past relevant work as an accounts receivable/payable clerk, as she performed it. This led the ALJ to conclude that Plaintiff was not under a disability, as defined by the Social Security Act, from her alleged onset date to the date of his opinion. (R. 21.)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a Plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the Plaintiff presently unemployed? (2) Does the Plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the Plaintiff unable to perform her former occupation? and (5) Is the Plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the Plaintiff is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The Plaintiff bears the burden of proof at steps 1–4. *Id.*

Once the Plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the Plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, or resolving conflicts in evidence. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a Plaintiff, "he must build an

accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a Plaintiff is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.  ANALYSIS

Plaintiff argues that the ALJ's decision must be remanded because: (1) the ALJ should have identified Plaintiff's anxiety and depression as medically determinable impairments; (2) the ALJ erred in finding that none of Plaintiff's impairments met or equaled a listing; (3) the ALJ failed to properly weigh the

opinion evidence; and (4) the ALJ's RFC assessment did not account for all of Plaintiff's limitations.[2]

## A. <u>Depression and Anxiety</u>

Plaintiff first contends that the ALJ erred in finding that her complaints of depression and anxiety were not medically determinable impairments. Although he noted that Plaintiff cried throughout the hearing, the ALJ found no medically determinable mental impairment because she has received no medication or counseling, and the consulting physician did not offer any specific DSM-IV or -V diagnosis. In support of her allegation that she suffers from mental impairments, Plaintiff points to the fact that she did undergo counseling in 2001 and took antidepressants for three years as well as Dr. Tumlin's report documenting her feelings of depression, hopelessness, and anxiety about her loss of function as well as disturbances in her thinking. She argues that the ALJ's failure to include mental impairments in his analysis led to a flawed RFC finding.

However, as the Commissioner correctly points out, the burden of showing a medically determinable impairment rests on the claimant. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The existence of a mental impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *see also* 20 C.F.R. § 404.1528(a) (noting that a person's statements alone do not establish the existence of an impairment).

---

[2] Plaintiff also argues that the ALJ failed to resolve an inconsistency between the testimony of the vocational expert and the Dictionary of Occupational Titles. But because the ALJ found Plaintiff could return to her past work, the testimony was not relevant to the decision, and the argument need not be addressed.

Plaintiff has offered no clinical or diagnostic evidence that she suffered from a severe mental impairment during the time of alleged disability. Accordingly, the ALJ's finding was not in error.

**B.** **<u>Listings</u>**

Plaintiff next contends that the ALJ improperly found at step 3 that her lupus was not at listing-level severity and further that he should have analyzed the listing in combination with her fibromyalgia. Listing 14.02 governs systemic lupus erythematosus ("SLE") and requires:

> (A) Involvement of two or more organs/body systems, with: (1) One of the organs/body systems involved to at least a moderate level of severity; and (2) At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)[;] or
>
> (B) Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: (1) Limitation of activities of daily living. (2) Limitation in maintaining social functioning. (3) Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.02.

The ALJ concluded that the A criteria of the listing were not met because her lupus "has not resulted in severe fatigue, fever, malaise, or involuntary weight loss." (R. 17.) He further found that the B criteria were not met because he found no restriction in the functional areas.

Plaintiff contends that the B criteria have been met because ME acknowledged that she exhibited "fatigue and, since it is almost the same, malaise." (Pl.'s Mem. at 8.) First, the ME did not conclude that she exhibited both fatigue and

14

malaise. In questioning the ME, Plaintiff's attorney mentioned "if fatigue and malaise are really roughly the same thing..." (R. 63.) The ME responded by stating: "Well, fatigue is tiredness. Malaise is more of an inertia, I think," after which he agreed with the attorney that "[f]atigue has been reported in the record, yeah." (*Id.*) He stated nothing about Plaintiff suffering from malaise, and counsel did not press the point. Second, Plaintiff's brief fails to direct the Court to any record evidence that she suffered repeated manifestations of SLE during the relevant period. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(I)(3) (explaining that "repeated" means the manifestations occur an average of three times per year for two weeks or more; more than three times per year if they last less than two weeks; but less than three times per year if they last substantially longer than two weeks).[3] Finally, even assuming those criteria were met, Plaintiff does not argue she suffered any marked functional limitations, as required by the listing. *See id.* Listing 14.00(I)(5) (explaining that a marked limitation is one that seriously "interferes with [one's] ability to function independently, appropriately, and effectively"). Therefore, the ALJ's failure to expressly analyze the listing in combination with her fibromyalgia, even if one assumes that was in error, was harmless.

C. **Weighing of Opinion Evidence**

Plaintiff argues that the ALJ did not appropriately weigh the available opinion evidence, particularly the opinion of her treating rheumatologist, Dr. Palella. An ALJ must give controlling weight to a treating physician's opinion if the

---

[3] To the extent that any such evidence may be contained in the voluminous record, the Court declines to locate it on Plaintiff's behalf. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must also "offer good reasons for discounting" the opinion of a treating physician. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted); *Scott*, 647 F.3d at 739. And even if a treating doctor's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit. *Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308. The regulations require the ALJ to consider a variety of factors, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. *See id.*

The ALJ listed a number of reasons Dr. Palella's opinion was given little weight, including that his notes reflected Plaintiff's subjective complaints rather than objective clinical findings; he continued to prescribe immunosuppressants and anti-inflammatory medications despite a negative inflammatory marker test in January 2012; June 2013 test results failed to show any abnormal end organ damage markers, such as markedly abnormal cardiac or kidney function results; and Plaintiff has not required hospitalization for her lupus or any other symptom. In addition, the ALJ noted that Dr. Palella's notes on which his disability opinion was based primarily addressed fibromyalgia rather than the lupus for which he was treating her. However, the medical record did not support a finding that her fibromyalgia was disabling. According to Dr. Kale, although Plaintiff exhibited

"classic fibromyalgia," she had no joint synovitis, including no joint redness, swelling, or thickening; no difficulty with fine or gross manipulation; and her memory, appearance, behavior, and concentration were within normal limits, which was inconsistent with her claim of "fibro fog."

Furthermore, the ALJ faulted Dr. Palella's conclusions that the side effects of her pain medications would affect Plaintiff's ability to work because he never charted any of her side effects. His recommendation that she undergo physical therapy was also suspect because it arose for the first time in the assessment, rather than two years earlier when he first began seeing her and before he began her on a regimen of narcotic pain medication. Dr. Palella's conclusion that she could only sit for one out of eight hours was belied by Plaintiff's testimony that she sat for hours while volunteering to play with cats. Finally, the ALJ found that Dr. Palella's opinion in the functional assessment that Plaintiff can only engage in limited stress situations and limited interpersonal relations exceeded the scope of his expertise as a rheumatologist and was inconsistent with the conclusions of the mental health professionals in the record. The ALJ therefore found the entire functional assessment to be suspect. The Court concludes that although other reviewers may have viewed the record differently, the ALJ's analysis was not conclusory and was clearly supported by substantial evidence.

**D.     RFC**

Plaintiff contends the ALJ erred in concluding that she had the RFC to perform light work with certain other restrictions because he did not take into

account her subjective complaints of pain, malaise, and fatigue, as well as the side effects of her medication. But Plaintiff fails to explain exactly how her subjective complaints result in specific functional restrictions and are inconsistent with the light RFC found by the ALJ. Merely suffering from pain and fatigue is not, by itself, proof of an inability to work. Similarly, Plaintiff's argument that her medications "can" or "could impair function at work," (Pl.'s Mem. at 11), does not demonstrate that she actually experiences side effects to a disabling degree.

The only record evidence of a functional restriction more severe than that found by the ALJ is the opinion of Dr. Palella, which the ALJ gave sufficient reasons for discounting. The ALJ also gave reasons for discounting Plaintiff's claims of wholly disabling symptoms, including the lack of objective medical evidence in support; her ability to drive and volunteer at a pet shelter; and her hobby of painting figurines. Although Plaintiff is correct that none of these activities is by itself proof that she can sustain full-time employment, it was not improper for the ALJ to consider that they show her symptoms are not as disabling as alleged. Because Plaintiff's claim of disability is premised on her subjective symptoms rather than clinical findings showing functional restrictions, the Court finds that the ALJ's decision to discredit her claims on that basis and instead to rely on the opinion of the ME was sufficiently articulated to withstand judicial scrutiny.

**CONCLUSION**

For the foregoing reasons, Plaintiff Jennifer S. Olszowka's motion for summary judgment [Doc. No. 13] is denied and the Commissioner's cross-motion for summary judgment [Doc. No. 22] is granted.

SO ORDERED.                    ENTERED:

DATE:    January 3, 2017       _____
                               **HON. MARIA VALDEZ**
                               **United States Magistrate Judge**